On the Merits.
Plaintiff, who was about 19 years old,, was employed on the Belt Railroad (which is owned by defendant and operated by a. commission), and had been so employed for about seven months, when he met with the-accident out of which this suit for damages has arisen. The undisputed facts leading to-the accident were as follows: Defendant was-one of two switchmen who were working on; a switching engine which had been sent on Friday morning (May 6, 1910) upon a special mission to deliver some cars to a vessel which was to sail the next day. For some-reasons not explained, the cars were not delivered, and it was necessary that the engine should go back in the evening and perform that service, which was not completed until late at night. At 15 or 20 minutes past 12 o’clock (on Saturday morning May 7th) the engine was on its way from the upper part of the city back to the roundhouse (which is on the levee front near the head of St. Louis street), and was moving at the rate of say 3Yst miles an hour on the second *989 or inside main track; plaintiff being half seated upon the drawhead, with bis right leg hanging over in front and his left foot resting upon the footboard. When it reached a point in the railroad yards between Girod and Lafayette streets, it came in contact with a flat car which was standing on the track, and plaintiff’s right leg and the flesh of his left leg were caught and mashed between the two drawheads, which coupled automatically. Plaintiff gave the following, with other testimony, upon his original examination:
“I had my right leg resting on the draw-head, and was standing with the left leg on the footboard. * * * They didn’t have any headlight on the engine. If they had had a headlight, I would have seen the car. * * * They had a headlight there, but it wasn’t -lit, * * * because they didn’t have any oil in it. I heard the engineer say so. * * * I didn’t (hear him ask for oil). * * * I had a lantern in the early part of the night, but it went out. It was loaned me from the other crew, and didn’t have enough oil to burn. It burned about an hour and went out. * * * Yes, sir; (it burned out because of lack of oil). * * * No, sir; (did not see flat car). I saw it after we run into it, not before. * * * I might (have seen it if I had been provided with a lamp), hut I could have seen it if the headlight was burning, certainly.”
Wilcox, foreman of the crew, having testified that about 7 o’clock in the evening he had given plaintiff “a brand new Casey switch lamp,” which he obtained from Bis-so’s store, filled with headlight oil, and Phelps, superintendent of the road, having testified that he was present when the lamp was given to plaintiff, and that it was in good order, burning brightly, plaintiff was recalled in rebuttal, and gave the following testimony:
“Q. You heard yesterday when the witness * * * testified to the fact that a brand new lamp was given you that was gotten from Bis-so’s? A. Yes, sir. Q. Why was it that a new lamp had to be gotten there? A. Because it (sic) didn’t have no other lamp. Q. Who furnishes the lamp to the switchmen? A. You get them from the Belt. You pay a dollar security on them. Q. Were you furnished with a lamp? A. Yes, sir. Q. At what time did you get your lantern? A. At 12 o’clock, when we go to dinner. Q. On the 6th of May did the engine go into the roundhouse for dinner?' A. No, sir. Q. Stayed out all day? A. Yes, sil'. Q. Did you have an opportunity to get your lantern that day? A. No, sir. * * * Q. What kind of oil was in that lamp? A. Insurance oil. Q. Could you do any flagging or signaling with that lamp? A. No, sir; every time you swing, if you have insurance oil and you swing it, it will go out, every time. * * * Q. What kind of oil did you use in your lamps? A. Signal oil.”
Cross-examination:
“Q. Were you present when the oil was put in that lamp? A. No, sir; but I opened it and looked at it and I know insurance oil from, signal oil. Q. Why did you do that? A. Did that at the time. I wanted to see what the trouble was. When I opened it, I discovered that it was about half full of insurance oil— between one-quarter and half full.”
Daussat, the engineer, testifies: That he could not see the flat car. That the headlights of the engine were not burning. They did not have supplies for the headlights, “didn’t have no oil, was one thing,” had lighted the headlights about 7 o’clock, but. they only burned about two hours. They were short of oil; “didn’t have no more oil.” It is the duty of the engineer to see that the. headlights are lighted.
“I lighted them about 7 or 7:30 o’clock. Mr. Phelps (the superintendent) made the remark to me then, ‘Haven’t you got headlights?’ I lit the lights then when Mr. Phelps mentioned it. * ■* * He asked me what was the matter with the headlights and I lit them. We hadn’t time before that. We were going ahead and didn’t have time to light them. * * * Yes,, sir (was standing alongside the car at that time). We were looking up for the cars at that time. Q. You say there was no oil? A. No, sir. Q. How do you know that? A. Because the fireman told me he asked for it, and they did not have it in the roundhouse. Q. When did he tell you that? A. That night. * * * Q. Was that before Mr. Phelps had left there? A. I don’t know. I can’t remember.”
Conners, machinist in charge of the roundhouse, testifies that there was oil there at all times, and that there was no reason why the engine in question should not have been supplied with it. Cross-examination:
*991 “Q. Why did you say, in answer to Mr. Reilley, that the engine was supplied with oil on the morning of the 7th of May, 1910, at the time of the accident? A. Because we always supply them. Q. Because you think it was, or should have been? A. It ought to have been, and it was. Q. Well, you didn’t see? A. Didn’t see it I know, but that is something we never fail to. do — supply oil. Q. Now, you repeat that it was supplied with oil on the morning of the 7th of May, 1910? A. The. morning of the 6th. Q. At the time of the accident you say it was? * * * A. On the morning' of the 6th it was supplied I say. I don’t know after that.”
[2] It is shown that the switchmen were at liberty to ride where they pleased on the engine, and were not obliged to ride on the footboard, and, still less, on the drawhead, which projects beyond the footboard, and is therefore the first part of the engine to meet another car with which the engine may come in contact; that by reason of that fact the footboard is a tolerably safe place, even when there is such contact, and that switchmen frequently make couplings while standing on it, whilst the drawhead is a highly dangerous place; that the “yards” where the accident occurred are used for the parking of cars and that it was to be expected that cars would be found there at any time, and-it is to be inferred from the testimony as well as from the conditions that it was well understood that it was necessary that the crews of engines moving into and through the yards for their own safety should be on the alert and proceed with caution, particularly if so moving at night without the usual lights. It is further shown that Eulton, another switchman, was standing on the footboard to the left (probably, about two feet) from plaintiff; that he saw the flat car at a distance of 15 feet before the engine struck it, and stepped off onto the ground without trouble or injury; and the testimony leaves no doubt in the mind that plaintiff would have escaped injury if, like Eulton, he had been merely standing on the footboard, and had not been half sitting on the drawhead with his leg hanging over in front of it. Our conclusions, from the whole evidence, are that, if the headlights of the engine .were insufficiently supplied with oil, which we are not convinced was the case, it was wholly due to the negligence of the engineer, whose duty it was to have seen to it that they were sufficiently supplied before leaving the roundhouse on the morning of May 6th, and who, we are satisfied, would have obtained the oil if he had asked the person whom he knew to be the proper person to ask; that, if plaintiff was without a lighted lantern at the moment of the accident, it was his own fault, as he had been given a new lantern, which had oil in it, at that time, whether headlight or insurance oil, which had burned brightly a few hours before, and would have burned brightly then; that in half seating himself on the drawhead plaintiff placed himself in about the only position on the engine in which he could have been injured by the slight collision between the engine and the car, but where, in the event of such collision, he was sure to be injured, a position in which he was not called upon by his duty to defendant to place himself and the danger of which he must be held to have assumed; that it was customary to leave cars upon the tracks in the yards which were intended for that use, and that plaintiff knew it and was bound to observe such reasonable precautions for his own safety, as that knowledge and the circumstances demanded, and that the consequences to him of his having failed so to do should not be visited upon the defendant.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that plaintiff’s demand be rejected and this suit dismissed, at his cost, in both courts.